IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 22-cv-02534-NYW-STV

MGA HOME HEALTHCARE COLORADO, LLC,

    Plaintiff,

v.

SHEA THUN,

    Defendant.

## ORDER ON MOTION TO DISMISS

This matter is before the Court on the Motion to Dismiss (or "Motion") filed by Defendant Shea Thun. [Doc. 53]. The Court has reviewed the Motion and the related briefing, the applicable case law, and the entire case file, and concludes that oral argument would not materially assist in the resolution of the Motion. For the reasons set forth below, the Motion is respectfully **DENIED**.

### BACKGROUND

This case arises out of Defendant Shea Thun's ("Mr. Thun" or "Defendant") previous employment with Plaintiff MGA Home Healthcare Colorado, LLC, ("MGA" or "Plaintiff") and his alleged use of Plaintiff's trade secrets to solicit MGA's customers and recruit its employees on behalf of a competitor. *See generally* [Doc. 51 (Plaintiff's Verified First Amended Complaint ("Amended Complaint"))].[1] MGA asserts three claims against Mr. Thun: (1) violation of the Defend Trade Secrets Act ("DTSA"), 18.U.S.C. § 836 *et seq.*, (Count I); (2) violation of the

---

[1] The Court draws the following factual background from Plaintiff's Amended Complaint, [Doc. 51], and presumes the well-pleaded allegations are true for purposes of this Order.

Colorado Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat. § 7-74-101 *et seq.*, (Count II); and (3) common law breach of contract (Count III). [Doc. 51 at 9–13]. Plaintiff seeks monetary and injunctive relief in the form of an order directing Defendant to return MGA's confidential information, prohibiting him from further using that confidential information, and requiring him to provide a list of all MGA patients he contacted since his termination. [*Id.* at 13–14].

## I.     Factual Background

MGA is an affiliate of a national network of home healthcare providers who offer various in-home medical services to patients including private duty nursing, skilled nursing visits, occupational therapy, physical therapy, and speech therapy. [*Id.* at ¶ 6]. As relevant here, some of MGA's caregiver-employees are parents of patients who receive MGA's medical services. *See, e.g.*, [*id.* at ¶¶ 26, 28, 31]; [Doc. 53 at 2].

Mr. Thun was employed as a Lead Client Service Manager at MGA from July 2018 to February 2022. [Doc. 51 at ¶¶ 9, 21]. In that role, Mr. Thun "was privy to MGA's highly confidential information, trade secret, employee compensation, customer contact, and service pricing information," which was "hosted on a secure, password protected, internal network, access to which was provided only to select employees on a need-to-know basis." [*Id.* at ¶¶ 10–11]. Additionally, MGA allowed Mr. Thun to use his personal device to conduct MGA business pursuant to the company's "bring your own device" ("BYOD") policy. [*Id.* at ¶ 17]. To do so, Defendant was permitted to install an "MGA application [on his personal device] which provides some access to MGA's network and data (e.g., limited and secure access to MGA information and email) while enabling MGA to wipe the phone of its confidential information." [*Id.*]. MGA's "employees are not supposed to save MGA's confidential information directly to their cellphones," as the company's "BYOD policy expressly prohibits comingling of personal and MGA

information and data." [*Id.* at ¶ 18].

When he was hired in June 2018, Mr. Thun signed an Employment Agreement that contained provisions to protect MGA's confidential information during his employment and after it ended, including that, after his termination from MGA, Mr. Thun would not use MGA's confidential information for any purpose at any time; and that, for 12 months after his employment ended, he would not solicit any of MGA's customers (the "Non-Solicitation Provision") or recruit its employees on behalf of any of MGA's competitors (the "Non-Recruitment Provision" and together, the "Restrictive Covenants"). [*Id.* at ¶¶ 9, 12–14, 50]; *see also* [*id.* at 17–22 (Exhibit A)].[2] In signing the Employment Agreement, Mr. Thun agreed that MGA's "Confidential Information" included:

> confidential, commercially sensitive, proprietary, and trade secret information that is not publicly available, including but not limited to private lists of customers and employees, prospective direct hire candidates and employees, employee applications, resumes, skills inventory reports and similar summaries of employee and candidate qualifications, customer billing rates and temporary employee pay rate schedules, revenue and expenses, sales reports and analyses, employee reports and analyses, customer job orders, methods of operation, sales techniques, statistical information, the contents of training, operational, procedural and sales manuals, computer programs, phone numbers and contact persons and the like.

[*Id.* at 18 (Exhibit A)]. And when MGA terminated Mr. Thun's employment on February 14, 2022, he signed a Severance Agreement and General Release ("Severance Agreement") wherein he confirmed that he did not possess or control any of MGA's property, "including, but not limited to [MGA] documents, materials, computer disks and other records," he was complying with the

---

[2] In ruling on a motion to dismiss, the Court may "consider documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quotation omitted). The Employment and Severance Agreements (and text communication between Plaintiff and E.L. discussed below, *see supra* at 4–5) are referenced and quoted in the Amended Complaint, *see, e.g.*, [Doc. 51 at ¶¶ 12–14, 21–22], to which they are attached, and neither Party disputes the documents' authenticity.

3

Restrictive Covenants in his Employment Agreement, and he would continue to do so. [*Id.* at ¶¶ 21–22]; *see also* [*id.* at 28–34 (Exhibit C)].

MGA now asserts that "during the course of [his] employment, [Mr.] Thun saved customer and caregiver/employee contact information directly to his personal cell phone in violation of MGA's [BYOD] policy," [*id.* at ¶¶ 19, 34], and "gained knowledge of the salary and compensation structure of [particular MGA] employees," [*id.* at ¶ 33]. With that information, Plaintiff claims, Mr. Thun has "solicited MGA's employees and customers while working for" his new employer, Amazing Care Home Health Services, LLC, ("Amazing Care"), "one of MGA's direct competitors," in violation of "the express terms of the Employment Agreement and [Mr.] Thun's reaffirmation and acknowledgement of those terms in the Solicitation Agreement."[3] [*Id.* at ¶¶ 23–24]; *see also* [*id.* at 33–34].

MGA cites three specific instances in which it alleges Mr. Thun engaged in such solicitation and recruitment. [*Id.* at ¶¶ 28–30]. First, MGA claims that "[o]n or about September 5, 2022," it "received a text message from a parent/caregiver/employee of MGA, 'E.L.,' explaining that she was offered a position at Amazing Care by Mr. Thun" at a "wage of $19.50 per hour, a higher rate than offered by MGA." [*Id.* at ¶ 28]; *see also* [*id.* at 35–36 (Exhibit D)]. Although "MGA was able to salvage the relationship with E.L," Plaintiff avers, it "had to increase her wages as a direct result of [Mr.] Thun's solicitation." [*Id.* at ¶ 28]. Two days later, MGA alleges that Mr. Thun "enticed another caregiver/employee, 'H.P.,' to leave MGA and join Amazing Care." [*Id.* at ¶ 29]. H.P. stayed at Amazing Care for "[a]pproximately one month" before opting to return

---

[3] Plaintiff appears to have mistakenly referenced a "Solicitation Agreement" here, as opposed to the Severance Agreement discussed just two paragraphs above in the Amended Complaint. *Compare* [Doc. 51 at ¶ 22 (describing Severance Agreement)], *with* [*id.* at ¶ 24 (referencing, for the first time, a "Solicitation Agreement")].

4

to MGA, but during that month, MGA claims to have "lost revenue in excess of $10,000." [*Id.*]. Finally, MGA asserts that, after "continuously reaching out to the father of two MGA patients who are twins (the 'M-Twins')" in late September or early October 2022, and "peppering the father with numerous conversations, [Mr.] Thun eventually persuaded him to transition to Amazing Care," causing MGA to incur revenue losses in excess of $100,000. [*Id.* at ¶ 30].[4] MGA also states that when it initially learned of Defendant's alleged solicitation of MGA's employees and "customers/caregiver-employees," MGA sent Mr. Thun two cease and desist letters, neither of which Defendant answered. [*Id.* at ¶¶ 24–27].

## II. Procedural Background

MGA initiated this civil action against Mr. Thun on September 28, 2022, by filing its Complaint, [Doc. 1], along with a Motion for Preliminary Injunction ("PI Motion"), [Doc. 2], which Plaintiff later withdrew with this Court's permission, *see* [Doc. 37]; [Doc. 41]. As pertinent here, Plaintiff subsequently filed its Amended Complaint as a matter of right. *See* [Doc. 51]; *see also* [Doc. 50 at 9 (construing Plaintiff's proposed Verified First Amended Complaint as filed as a matter of right and denying the accompanying Motion to Amend, [Doc. 28], as moot)].

---

[4] In his Motion, Defendant directs the Court to various affidavits outside the pleadings. *See, e.g.*, [Doc. 53 at 3 n.3 (citing [Doc. 33-4])]; [*id.* at 3 (citing [Doc. 27-1])]; [*id.* at 14 (citing [Doc. 33-3])]. Generally, a court may not consider materials other than those attached to the complaint in ruling on a motion to dismiss without converting the motion into one for summary judgment, unless the documents "are central to the plaintiff's claims, referenced in the complaint, and . . . the parties do not dispute [their] authenticity." *Snyder v. Beam Techs., Inc.*, No. 20-cv-03255-NYW, 2021 WL 4947295, at *4 (D. Colo. Aug. 16, 2021). Neither Party has requested conversion of the instant Motion to Dismiss to one for summary judgment, and Plaintiff expressly opposes such treatment. *See* [Doc. 58 at 15 n.3]. Therefore, because the affidavits cited by Mr. Thun are not referenced in the Amended Complaint and Defendant "makes no substantive argument that [they] are central to Plaintiff's claims," the Court respectfully exercises its discretion and declines to consider them. *Snyder*, 2021 WL 4947295, at *4; *see also* Civ. Practice Standard 7.1B(c) ("Rule 12(b) motions which rely on matters outside the pleadings shall address the basis for the Court to consider such documents and whether the motion should or should not be converted into a motion for summary judgment.").

Plaintiff alleges that "[t]he employee compensation, customer contact, and service pricing information contained within MGA's secure system qualifies as a trade secret" under both the DTSA and CUTSA and that Defendant misappropriated those trade secrets, in violation of federal and state law, when he "took [that] confidential information in the MGA systems" without MGA's consent and used it to solicit and recruit MGA's customers and/or employees on behalf of Amazing Care. *See* [Doc. 51 at ¶¶ 35–48 (detailing Counts I and II)]. Additionally, Plaintiff claims that in using this misappropriated trade secret information to solicit and recruit MGA's employees and customers during the 12-month period following his February 2022 termination, Mr. Thun breached the Restrictive Covenants in his Employment Agreement (and ratification of those terms in the Severance Agreement). [*Id.* at ¶¶ 49–55 (setting forth allegations supporting Count III)].

Mr. Thun filed the instant Motion to Dismiss in June 2023, arguing, pursuant to Rule 12(b)(6), that Plaintiff has failed to state a claim upon which relief can be granted. [Doc. 53]. Plaintiff filed a Response to the Motion ("Response"), [Doc. 58], to which Defendant replied, [Doc. 59]. Accordingly, the Motion is fully briefed and ripe for disposition.

## LEGAL STANDARD

Rule 12(b)(6) permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a Rule 12(b)(6) motion to dismiss, the court must determine whether the well-pleaded factual allegations in the plaintiff's complaint alone are legally sufficient to state a claim, *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006), that is, whether the plaintiff has "sufficiently allege[d] facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed," *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). At this stage, the court's function "is not to weigh potential evidence that the parties might present at trial." *Tal*, 435 F.3d at 1252 (internal

quotation marks omitted). Instead, the court "accept[s] as true all well-pleaded factual allegations . . . and view[s] these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (internal quotation marks omitted).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247, 1249 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible"). A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But even though "allegations that are so general that they encompass a wide swath of conduct, much of it innocent, will not be sufficient," the complaint "need only give fair notice of what the claim is and the grounds upon which it rests." *Animal Care Sys., Inc. v. Hydropac/Lab Prods., Inc.*, No. 13-cv-00143-MSK-BNB, 2015 WL 1469513, at *3 (D. Colo. Mar. 26, 2015) (cleaned up); *see also S.E.C. v. Shields*, 744 F.3d 633, 640–41 (10th Cir. 2014) (same).

## ANALYSIS

With that standard in mind, the Court turns to the instant Motion to Dismiss. The Court first addresses Defendant's arguments that Plaintiff's claims for trade secret misappropriation (Counts I and II) should be dismissed, followed by his arguments for the dismissal of Plaintiff's claim for breach of contract (Count III).

### I. Plaintiff's Claims for Trade Secret Misappropriation under the DTSA and CUTSA (Counts I and II)

Mr. Thun first contends that Plaintiff has failed to allege facts supporting the three elements necessary to make out a claim for misappropriation of trade secrets under either the DTSA or

CUTSA. According to Defendant, MGA has not established (1) that it possessed a trade secret, (2) that Defendant used MGA's alleged trade secrets without MGA's consent, or (3) that Mr. Thun acquired such trade secrets by improper means. [Doc. 53 at 1, 5–10]; [Doc. 59 at 2–6]; *see also Arctic Energy Servs., LLC v. Neal*, No. 18-cv-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018) (outlining the elements of trade secret misappropriation under the DTSA and CUTSA: (1) the plaintiff's possession of a trade secret, (2) the defendant's use or disclosure (or, in the case of the DTSA, acquisition) of the trade secret without consent, and (3) the defendant's knowing or having reason to know that the trade secret was acquired by improper means).

For the following reasons, the Court finds that, drawing all factual averments in favor of the non-moving party as it must, Plaintiff has set forth sufficient factual allegations to give Defendant fair notice of its federal and state law claims for trade secret misappropriation and the grounds on which those claims rest. *Shields*, 744 F.3d at 640–41; *see also SBM Site Servs., LLC v. Garrett*, No. 10-cv-00385-WJM-BNB, 2012 WL 628619, at *10 (D. Colo. Feb. 27, 2012) (observing that trade secret misappropriation claims are not "subject to a heightened pleading standard that requires greater particularity," rather, pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, only a "short, plain statement of the claim showing that the pleader is entitled to relief" is required (quoting Fed. R. Civ. P. 8(a)(2)).

### A.   Possession of Trade Secrets

Defendant contends that MGA's customer contact list and employee compensation information[5] cannot qualify as trade secrets under either the DTSA or CUTSA because MGA does not own the contact or compensation information of its individual customers and employees and,

---

[5] Mr. Thun does not appear to challenge that Plaintiff's allegation that the "service pricing information contained within MGA's secure system qualifies as a trade secret" is sufficient, at least at this stage of the proceeding. *See* [Doc. 51 at ¶ 38].

accordingly, that information is often publicly available. [Doc. 53 at 7–10]. Mr. Thun, however, mistakes the character of the alleged trade secrets: Plaintiff does not assert that contact information and/or compensation information of individual customers and/or employees qualify as trade secrets, instead it is Plaintiff's "customer contact list" and "employee compensation information," including the "employee compensation structures," "contained within MGA's secure system" that MGA alleges are trade secrets. *See, e.g.*, [Doc. 51 ¶¶ 38–39, 45]. This distinction makes a difference.

The DTSA's definition of "trade secret" covers "'all forms and types of . . . business . . . information' so long as 'the owner thereof has taken reasonable measures to keep such information secret' and 'the information derives independent economic value, actual or potential, from not being generally known to,' or ascertainable by, another person." *Arctic Energy Servs., LLC*, 2018 WL 1010939, at *2 (quoting 18 U.S.C. § 1839(3)). As with the DTSA, CUTSA defines "trade secret" broadly to include "the whole or any portion or phase of any . . . confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." *Id.* (internal quotation marks omitted) (quoting Colo. Rev. Stat. § 7-74-102(4)).

Courts look to several factors in determining what constitutes a "trade secret" under Colorado law, including:

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.*, by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Id.* (alterations omitted) (quoting *Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005)). Importantly, "a trade secret can exist in a combination of characteristics, each of which,

9

considered separately, is in the public domain, but, taken together, may yield a competitive advantage that results in a protectable trade secret." *Id.* (internal quotation marks omitted) (quoting *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1130 (10th Cir. 2003)); *Atlas Biologicals, Inc. v. Kutrubes*, No. 15-cv-00355-CMA-KMT, 2019 WL 4594274, at *14 (D. Colo. Sept. 23, 2019) ("Information can be a trade secret notwithstanding the fact that some of its components are well-known.").

Accordingly, Courts have generally acknowledged that "[a] customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1114 (10th Cir. 2009); *see also SRS Acquiom Inc. v. PNC Fin. Servs. Grp., Inc.*, No. 19-cv-02005-DDD-SKC, 2020 WL 3256883, at *7 n.7 (D. Colo. Mar. 26, 2020) (collecting cases). The Court sees no reason why the same is not true of a company's confidential employee compensation information, when developed through the employer's time, effort, and expense, even where an individual employee's wage rate is otherwise publicly accessible. *Cf. Graystone Funding Co. v. Network Funding, L.P.*, No. 2:19-cv-00383-JNP-CMR, 2021 WL 4460113, at *5 (D. Utah Sept. 29, 2021) (acknowledging that the plaintiff's employee compensation information could constitute a trade secret under the DTSA and Utah Uniform Trade Secrets Act prior to the plaintiff's voluntary disclosure of that information to the defendant); *Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 505 F. Supp. 2d 1178, 1187 (D. Utah 2007) (finding that a reasonable jury could conclude that the plaintiff's alleged trade secrets, including its employee compensation information, had been misappropriated by the defendant).

Here Plaintiff alleges that the customer lists, employee compensation information, and pricing information "contained within MGA's secure system" constitute trade secrets under the

DTSA and CUTSA.  *See* [Doc. 51 at ¶¶ 35–42, 43–48].  According to MGA, these categories of protected business information "not only contain [the] basic contact information of MGA's patients, but also treatment plans, progress notes and other medical data specific to MGA's patients, as well as [its] compensation structures, and the price points for various service offerings."  [*Id.* at ¶ 45]; *see also* [*id.* at ¶¶ 38–39].  This information, Plaintiff avers, "was derived as a result of significant relationship-building with potential referral sources and from significant market research by MGA," and the alleged trade secrets "derive their own economic value as they are not generally known or ascertainable by another person not authorized by MGA to access the information."  [*Id.* at ¶¶ 38–39].  To that end, MGA has taken steps to protect the confidentiality of the information, including by storing it on a "password protected, internal network, access to which was provided only to select employees on a need-to-know basis," [*id.* at ¶ 11]; requiring employees to promise to maintain the confidentiality of that information, including by refraining from using the information following their termination for any purpose, [*id.* at ¶ 12]; and maintaining a BYOD policy that allowed employees to access MGA's network and data on their personal phones through an app yet prohibited them from downloading such data onto personal devices directly, [*id.* at ¶¶ 17–18].  *See also* [*id.* at ¶¶ 40, 45].

Such allegations, the Court finds, are sufficient to demonstrate, at the motion to dismiss stage, that Plaintiff possessed trade secrets for purposes of the DTSA and CUTSA.  *See, e.g.*, *Atlas Biologicals, Inc.*, 2019 WL 4594274, at *16 (concluding that the plaintiff had demonstrated by a preponderance of the evidence that "the information contained in [its] customer database, and documents that were created with [that] information" were trade secrets under CUTSA, even though "some of the customers' contact information was available to the public on the customers' websites," because (1) the documents taken by the defendant "contained far more than basic

11

contact information" such as "past sales to the customers"; (2) employees only had access to the customer database on a need-to-know basis; (3) the customer database was password protected; and (4) the customer database gave the plaintiff a significant competitive advantage over competitors); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011) (finding that client and debtor information stored within the plaintiff's proprietary database qualified as trade secrets under CUTSA because such information was confidential and not known outside the business, password protected, and accessible only on a "need to know" basis"); *Arctic Energy Servs., LLC*, 2018 WL 1010939, at *2–3 (concluding the plaintiff had sufficiently demonstrated for purposes of a motion for preliminary injunction that it possessed trade secrets where the plaintiff protected its confidential information by including confidentiality warnings in company emails, using employee nondisclosure agreements, and restricting access to confidential information on the company server and to offices containing such information).

### B. Use of Trade Secrets

Next, Defendant appears to argue that because Plaintiff does not allege that Mr. Thun used its entire customer contact list or documents detailing MGA's employee compensation structure in soliciting or recruiting customers and employees, and instead only used some of that information—namely the contact information of employees and/or customers downloaded onto his personal phone in violation of company policy—MGA has failed to allege that he "used its trade secret compilations or methodologies." *See, e.g.*, [Doc. 53 at 6]; *see generally* [*id.* at 6–7]. Defendant provides no caselaw supporting his assertion that using part of a trade secret is permissible so long as the allegedly misappropriating party does not use the whole compilation or its underlying methodology, nor is this Court aware of any such cases. *Cf. Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1116 (D. Colo. 2016) (finding that genuine issue of material fact existed as to whether the defendants used or disclosed the plaintiff's trade secret

12

where there was evidence that defendants (1) "knew some of th[e] trade secret [information], such as the contacts for . . . customers and where they reside[d]"; (2) the record permitted "a reasonable inference . . .that the[] [d]efendants also retained some of this information," given that they had communicated with those customers; and (3) "there [wa]s evidence that [the defendants] knew whom to reach out to" at the customer corporations based on information acquired from plaintiff).

The Court finds the Amended Complaint plausibly alleges that Mr. Thun used MGA's trade secret information, in the form of its contact lists, employee compensation structure, and service pricing schemes, to solicit MGA's customers and recruit MGA's employees after he left MGA.  Specifically, Plaintiff claims that Mr. Thun "saved customer and caregiver/employee contact information directly to his personal cell phone in violation of [company] policy" and used that "contact information to directly solicit MGA's caregivers and customers" along with "information related to MGA's employee compensation structure" to which he was privy during his time as a Lead Client Service Manager.  [Doc. 53 at ¶¶ 10, 19, 41, 46–47].  In support, Plaintiff cites three specific instances of Defendant's engaging in alleged solicitation and/or recruitment, which, taken as true, create a reasonable inference that Mr. Thun retained customer and/or employee contact information from the customer list and used his knowledge of MGA's confidential employee compensation structure and service pricing information to solicit and/or recruit its customers and/or employees.  *See Wells Fargo Ins. Servs. USA, Inc.*, 276 F. Supp. 3d at 1116 (acknowledging that "the mere fact" that a plaintiff's customer switched to a competitor does not mean that the defendants necessarily used or disclosed the plaintiff's trade secrets, but nevertheless finding that evidence that the defendants "knew whom to reach out to" at the customer corporations because of information gained from the plaintiff was sufficient to preclude summary judgment on the issue of use or disclosure); *cf. Ciena Commc'ns, Inc. v. Nachazel*, No. 09-cv-

13

02845-MSK-MJW, 2010 WL 3489915, at *4 (D. Colo. Aug. 31, 2010) (concluding that the plaintiff's statement that the defendants "have misappropriated, or threaten to misappropriate [the plaintiff's] trade secrets for the purpose of using and exploiting such information" was too conclusory to survive a motion to dismiss because "it [did] not explain what specific facts . . . led [the plaintiff] to the conclusion" that misappropriation occurred, "*e.g.* that [the defendant] has begun contacting [customer] representatives that [the plaintiff] previously had exclusive contact with," or "produced product literature comparing its products to [the plaintiff's] using information that was previously only known inside [the plaintiff corporation], etc."). To be sure, Defendant disputes these factual allegations, *see* [Doc. 53 at 11–15], but such objections are not properly considered at this point. *See Tal*, 453 F.3d at 1266 ("Rule 12(b)(6) motions to dismiss are not designed to weigh evidence or consider the truth or falsity of an adequately pled complaint.")

### C. Improper Acquisition of Trade Secrets

As to the final element of Plaintiff's claims for trade secret misappropriation, the Court finds that MGA has sufficiently alleged that Mr. Thun improperly acquired the trade secrets in question. *But see* [Doc. 53 at 6, 10 (arguing that Plaintiff "does not allege that Mr. Thun acquired trade secrets by an improper means" without further support or explanation)].

The DTSA and CUTSA "both define 'improper means' to include 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy.'" *Snyder v. Beam Techs., Inc.*, No. 20-cv-03255-NYW, 2021 WL 4947295, at *9 (D. Colo. Aug. 16, 2021) (quoting 18 U.S.C. § 1839(6); Colo. Rev. Stat. § 7-74-102(1)). Taking Plaintiff's allegations as true, Mr. Thun knew that, as an employee, he was being "given access to certain of [MGA's] confidential, commercially sensitive, proprietary, and trade secret information that is not publicly available, including but not limited to private lists of customers and employees . . . customer billing rates . . . phone numbers and contact persons and the like," [Doc. 51 at 18], agreed to "take

14

reasonable steps to maintain the confidentiality" of such information during his employment," [*id.* at ¶ 12], and promised that after he was terminated, he would not use any such information "for any purpose at any time," [*id.*]. In saving customer and employee contact information from MGA's secure network to his personal cell phone and using that information to solicit and recruit MGA's customers and employees, Defendant "breach[ed] . . . [his] duty to maintain secrecy," *Snyder*, 2021 WL 4947295, at *9, as articulated in his Employment Agreement and reiterated in his Severance Agreement, *see* [Doc. 51 at ¶¶ 14, 22]. *See Atlas Biologicals, Inc.*, 2019 WL 4594274, at *16 (finding that the plaintiff had proven acquisition by improper means where the defendant "knew of his duty to not disclose [the company's] customer list without [its] approval; that duty was clearly articulated in [the company's] confidentiality policy, with which [defendant] was familiar"); *see also* [Doc. 51 at ¶¶ 17–19 (alleging that Defendant also violated company policy prohibiting employees from saving confidential information onto their personal phones when he saved customer and employee contact information onto his cell phone)].

For the foregoing reasons, the Court respectfully **DENIES** the Motion to Dismiss as to Counts I and II.

## II. Plaintiff's Claim for Breach of Contract (Count III)

Mr. Thun next asserts that Plaintiff has failed to state a claim for breach of contract, arguing that the Restrictive Covenants within the Employment Agreement are void under Colorado law, which bans "[a]ny covenant not to compete . . . restrict[ing] the right of any person to receive

15

compensation for performance of skilled or unskilled labor for an employer."[6,7]  *See* Colo. Rev. Stat. § 8-2-113(2) (2018);[8] *see also* [Doc. 53 at 11].  Because MGA has not alleged that it possessed a valid trade secret, Defendant contends, the Restrictive Covenants do not fall within the only exception to Colorado's prohibition on covenants not to compete that could apply here, the exception for "[a]ny contract for the protection of trade secrets."  *See* Colo. Rev. Stat. § 8-2-113(2)(b) (2018);[9] *see also Great Am. Opportunities, Inc. v. Kent*, 352 F. Supp. 3d 1126, 1134 (D. Colo. 2018) (observing that for a contract to fall within the trade secrets exception, "a trade secret must exist").

---

[6] Defendant also argues, without citing any legal authority, that the Restrictive Covenants contained in the Employment Agreement violate "Colorado's public policy," because they "prevent a parent-caregiver from choosing what they believe to be the best healthcare option for their children." *See* [Doc. 53 at 15]; *see also* [*id.* at 11 n.7 (despite acknowledging that the August 2022 amendments to the Colorado statute prohibiting covenants not to compete, *see* Colo. Rev. Stat. 8-2-113, arguing, without further explanation or any citations to supporting authority, that "[t]he August 2022 revisions reflect the current climate of restrictive covenant agreements in Colorado and are public policy considerations directly applicable to this matter")]. "It is not this Court's duty to perform legal research on behalf of a party or find legal support for a party's unsupported arguments." *Coomer v. Lindell*, No. 22-cv-01129-NYW-SKC, 2023 WL 2528624, at *8 (D. Colo. Mar. 15, 2023).  Because Mr. Thun has failed to cite any source for his invocation of "Colorado's Public Policy for Patient Choice," this Court need not address Defendant's arguments based thereon. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.").

[7] Mr. Thun also raises factual challenges to MGA's allegations of solicitation, [Doc. 53 at 11–15], which the Court declines to consider in ruling on Defendant's Motion to Dismiss. *See supra* at 14 (citing *Tal*, 453 F.3d at 1266).

[8] All Parties agree that the August 2022 amendments to Colo. Rev. Stat. § 8-2-113 do not govern the Employment Agreement, which was signed on July 6, 2018. *See Allstate Ins. Co. v. Cruz*, No. 20-cv-03139-NYW-MEH, 2023 WL 6147077, at *8 n.5 (D. Colo. Sept. 20, 2023) (noting that the amendments to Colo. Rev. Stat. are not retroactive).

[9] Whether an exception to Colo. Rev. Stat. § 8-2-113 applies "is to be determined as of the time of the employee's departure." *Allstate Ins. Co.*, 2023 WL 6147077, at *8 n.5 (considering the applicability of the exception for contracts for the protection of trade secrets).  Here, MGA terminated Mr. Thun's employment on February 14, 2022, before the statutory amendments were enacted. [Doc. 51 at ¶ 21].

This argument is unavailing. First, although Colorado treats agreements not to solicit customers as covenants not to compete, *see Allstate Ins. Co. v. Cruz*, No. 20-cv-03139-NYW-MEH, 2023 WL 6147077, at *8 (D. Colo. Sept. 20, 2023), contractual prohibitions against recruiting employees are enforceable under state law, even if an accompanying noncompetition provision is invalid. *See Phoenix Cap., Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007). Thus, regardless of the Non-Solicitation Provision's validity, the Non-Recruitment Provision does not come within Colorado's general ban on noncompetition provisions. Second, because this Court has already concluded that Plaintiff has sufficiently alleged that its customer lists, employment compensation information, and service pricing information qualify as trade secrets, the Court cannot find that the Non-Solicitation Provision is void on the basis Defendant asserts.

The Court observes that, despite Plaintiff's allegations to the effect, *see* [Doc. 51 at ¶ 14], it remains to be determined whether the Non-Solicitation Provision's "purpose [is] the protection of trade secrets," as is required for the trade secret exception to apply here. *Gold Messenger Inc. v. McGuay*, 937 P.2d 907, 910–11 (Colo. App. 1997); *compare Saturn Sys., Inc.*, 252 P.3d at 526–28 (upholding non-solicitation clause where it was included "within a single confidentiality provision in the [contract at issue], designed to protect its 'client lists, sales materials, and proprietary information,' thereby expressing an intent to prohibit former employees . . . from using trade secrets to solicit former clients"), *and Gold Messenger Inc.*, 937 P.2d 907, 910–11 (finding that covenant not to compete fell within the trade secret exception to Colo. Rev. Stat. 8-2-113 when read in conjunction with the contract's preamble, which made evident "that the agreement was entered into with the express purpose of protecting trade secrets"), *with Colo. Account. Machs., Inc. v. Mergenthaler*, 609 P.2d 1125, 156 (Colo. App. 1980) (finding that where a "separate trade-secret nondisclosure provision adequately protected [the] plaintiff's interests, and the restrictive

covenant [wa]s not limited to enhancing this protection," the restrictive covenant provision was invalid), *and Dresser Indus., Inc. v. Sandvick*, 732 F.2d 783, 788 (10th Cir. 1984) ("A naked covenant not to compete is void under the statute and cannot be validated by the insertion of a companion clause dealing with trade secrets."). Nevertheless, the Court finds that Plaintiff has plausibly alleged that the Non-Solicitation Provision's aim is to protect MGA's trade secret information given the Employment Agreement's apparent preoccupation with securing the company's confidential information. *See, e.g.*, [Doc. 51 at 18–19 (first four paragraphs of the Employment Agreement discussing MGA's confidential information and the need to secure it, followed immediately after by the Non-Solicitation Provision)]. Accordingly, the Court respectfully **DENIES** the Motion to Dismiss as to Count III.

## III.   Damages

Finally, Defendant contends that each of Plaintiff's claims must be dismissed because MGA has not shown that it incurred damages as a result of Mr. Thun's conduct. [Doc. 53 at 15].

At the outset, the Court observes that Defendant incorrectly asserts that a claimant's showing of damages is a necessary element of trade secret misappropriation. *See* [Doc. 53 at 15]. As this Court has previously explained, neither the DTSA nor CUTSA supports this statement. *Snyder*, 2021 WL 4947295, at *20. "Indeed, CUTSA states that 'a complainant *is entitled to* recover damages for misappropriation,' including 'both the actual loss caused by misappropriation *and the unjust enrichment caused by misappropriation* that is not taken into account in computing actual loss.'" *Id.* (emphasis in original) (quoting Colo. Rev. Stat. § 7-74-104(1)). And, for its part, the DTSA provides that, "in a civil action for trade secret misappropriation 'a court *may* . . . award . . . damages for actual loss caused by the misappropriation of the trade secret; and . . . damages for *any unjust enrichment caused by the misappropriation* of the trade secret that

is not addressed in computing damages for actual loss.'" *Id.* (emphasis in original) (quoting 18 U.S.C. § 1836(b)(3)(B)(i)). Accordingly, if successful, a plaintiff may, pursuant to either the DTSA or CUTSA, obtain damages for actual harm, but may also be awarded damages for the defendant's unjust enrichment. *Id.* (citing *Cypress Advisors, Inc. v. Davis*, No. 17-cv-01219-MSK-KLM, 2019 WL 7290948, at *4 (D. Colo. Aug. 28, 2019)).

But even as to the breach of contract claim, for which a showing of causation and damage are required elements, *see W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992), the Court is satisfied that MGA has adequately pleaded the existence of harm or damages caused by Mr. Thun's alleged solicitation and recruitment efforts.  MGA asserts that it had a valid and enforceable Employment Agreement with Mr. Thun in which he promised to refrain from soliciting MGA's clients or recruiting its employees for a 12-month period following his termination, that Defendant breached the Employment Agreement when he engaged in solicitation and recruitment efforts less than twelve months after he was terminated, and that MGA has incurred damages as a direct and proximate result of Mr. Thun's actions.  [Doc. 51 at ¶¶ 49–55]. These allegations, the Court finds, are sufficient to put Mr. Thun on notice of the basis of Plaintiff's claims.  *See Snyder*, 2021 WL 4947295, at *21.

As touched on briefly above, this Court notes that most of Defendant's arguments challenge the substantive merits of these factual allegations or ask this Court to weigh evidence. A motion to dismiss is not the appropriate vehicle to do so.  *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." (cleaned

up)). In denying the instant Motion to Dismiss, this Court does not pass on the merits of these claims nor whether Plaintiff will be able to survive further dispositive motions or trial.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)  Defendant's Motion to Dismiss, [Doc. 53], is **DENIED**.

DATED: October 24, 2023

BY THE COURT:

_____
Nina Y. Wang
United States District Judge